IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KLAMATH TRIBES OF OREGON, MILLER ANDERSON, JOSEPH HOBBS, CATHERINE WEISER-GONZALEZ, ROBERT ANDERSON, JOSEPH KIRK, ORIN KIRK, LEONARD NORRIS, JR., PHILIP TUPPER, ROBERT BOJORCAS, and KLAMATH CLAIMS COMMITTEE,<br><br>    Plaintiffs,<br><br>    v.<br><br>PACIFICORP, an Oregon corporation,<br><br>    Defendant. | Civ. No. 04-644-CO<br><br>OPINION AND ORDER |

AIKEN, Judge:

Plaintiffs filed suit alleging trespass and violations of their fishing rights under the Treaty between the United States of America and the Klamath and Moadoc Tribes and Yahooskin Bank of Snake Indians, Oct. 14, 1864 (Treaty of 1864), 16 Stat. 707. See

1 - OPINION AND ORDER

United States v. Adair, 723 F.2d 1394, 1398 (9th Cir. 1983). On February 10, 2005, defendant moved for summary judgment, arguing that the termination of the Klamath Tribe, effective 1961, rendered any claim asserted by plaintiffs subject to the Oregon statutes of limitations, and that the limitations period regarding plaintiffs' treaty and trespass claims against defendant or its predecessors expired prior to the restoration of the Tribe's status in 1986.

On April 14, 2005, United States Magistrate Judge Cooney issued his Findings and Recommendation and recommended that defendants' motion for summary judgment be granted. Magistrate Judge Cooney found that the Klamath Termination Act "presents clear congressional intent to redefine the relationship between the Tribe [and the federal government] [and to] remove the special protections previously afforded the Tribe, and this requires the application of the state statute of limitations to the Tribe's claims." Findings and Recommendation, p. 8. Thus, Magistrate Judge Cooney found plaintiffs' claims barred as untimely. The matter is now before me. See 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b).

When either party objects to any portion of a magistrate judge's Findings and Recommendation, the district court must make a de novo determination of that portion of the magistrate judge's findings. See 28 U.S.C. § 636(b)(1); McDonnell Douglas Corp. v. Commodore Business Machines, Inc., 656 F.2d 1309, 1313 (9th Cir.

1981). Plaintiffs filed timely objections to the Findings and Recommendation. I have, therefore, given de novo review of Magistrate Judge Cooney's rulings. I agree that defendant's motion for summary judgment should be granted, although for different reasons than those asserted by defendant.

Plaintiffs do not contest the factual background in the Findings and Recommendation, and I will not repeat it here. Generally, plaintiffs seek damages resulting from the construction and continued operation of dams owned by defendant on the Klamath River. Plaintiffs allege that since 1916, the dams have blocked passage for fish and reduced river flows and water quality, and that the resulting depletion of steelhead and salmon runs interferes with their reserved treaty right to take fish.

Plaintiffs assert two claims for relief against defendant in their First Amended Complaint: one alleging that defendant has "violated the federal treaty rights of the plaintiffs to enjoy Treaty fishing, year to year, subject to varying River flows and appropriate conservation management"; the other alleging that defendant's actions "unlawfully trespass upon and interfere with federal protected property rights of the plaintiffs and their predecessors." First Amended Complaint for Damages, p. 8. Neither party nor Magistrate Judge Cooney distinguished these claims.

While plaintiffs' treaty rights claim is well-established, plaintiffs "federal common law" claim for trespass is questionable

3 - OPINION AND ORDER

based on the facts alleged. Generally, liability for trespass involve "invasions of the interest in the exclusive possession and physical condition of land." Restatement (Second) of Torts, div. 1, chap. 7, top. 1 (1965) (scope note); see also id. § 158. Indeed, relevant cases recognizing federal causes of action sounding in trespass were intended to protect the right of Indian tribes to occupy Indian lands. See United States v. Pend Oreille Pub. Utility Dist. No. 1, 28 F.3d 1544, 1549, n.8 ("The Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, including actions for ejectment, accounting of profits, and damages.") (citing cases).

Here, plaintiffs do not allege that the dams owned by defendant invade or interfere with the use and enjoyment of land possessed by the Tribe. To the extent that plaintiffs' treaty fishing rights support a property interest in former reservations lands, plaintiffs do not allege an invasion of such land so as to interfere with their ability to access these lands and exercise their right to take fish. Rather, plaintiffs allege violations of and interference with their treaty fishing rights caused by the dams' impact on river flows, water quality, and steelhead and salmon runs. See First Amended Complaint for Damages, pp. 3-4.

In their objections to the Findings and Recommendation, plaintiffs invoke federal takings law to support their argument that they may assert "federal trespass claims" against a third

party for unlawful interference with or destruction of their treaty fishing rights. While plaintiffs' treaty fishing rights are protected property rights subject to compensation for an unlawful taking by the federal government, see Muckleshoot Indian Tribe v. Hall, 698 F. Supp. 1504, 1513 (W.D. Wash. 1988), the existence of a property interest in treaty fishing rights does not necessarily support a federal common law claim of trespass against a private party where no invasion or interference with the possession, use, or occupancy of land is alleged.

Even if plaintiffs' second claim for relief could be construed as asserting trespass to chattel based on the alleged harm to fish caused by defendant's actions, the scope of plaintiffs' reserved right to take fish is defined by the Treaty of 1864. Restatement (Second) of Torts § 220 (1965) ("One who commits a trespass to a chattel is subject to liability to another who is entitled to the future possession of the chattel for harm thereby caused to such other's interest in the chattel."). Therefore, I construe plaintiffs' second claim for relief as one for interference with their fishing rights reserved by the Treaty of 1864, which is nothing more than the violation of treaty rights alleged in plaintiffs' first claim for relief. The question remains whether plaintiffs' claim seeking damages for violations of their treaty rights is barred by the statute of limitations.

Article I of the Treaty of 1864 reserves to the Klamath Tribe

"the exclusive right of taking fish in the streams and lakes, included in [the] reservation." Kimball v. Callahan, 590 F.2d 768, 770 (9th Cir. 1979). In 1954, Congress passed the Klamath Termination Act, effective as of 1961. 25 U.S.C. § 564, *et seq*.

> The purpose of the Act was to terminate federal supervision over the trust and restricted property of the Klamath Tribe of Indians, to dispose of federally owned property acquired or withdrawn for the administration of the Indians affairs, and to terminate federal services furnished the Indians because of their status as Indians.

Kimball, 590 F.2d at 770. Further, the Act provided that "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." 25 U.S.C. § 564q. The Act, however, expressly stated that "nothing" in the Act "shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty." Id. § 564m(b). Magistrate Judge Cooney nevertheless found that the language of the Termination Act unambiguously subjected all claims by plaintiffs to the relevant statute of limitations as of 1961, and that the statute of limitations relevant to plaintiffs' treaty claims ran prior to the Klamath Tribe's restoration in 1986.

Plaintiffs object to the Findings and Recommendation, arguing that the Klamath Termination Act did not expressly subject treaty claims to Oregon statutes of limitations, and that any construction of the Klamath Termination Act should be construed in their favor to preclude application of statutes of limitations to treaty rights

6 - OPINION AND ORDER

claims. Plaintiffs rely on County of Oneida v. Oneida Indian Nation, 470 U.S. 226 (1985), where the Supreme Court reaffirmed the right of Indian tribes to bring an action under federal common law to enforce or vindicate their "aboriginal land rights." Id. at 235. The Oneida Nation had sued to recover damages "representing the fair rental value" of land conveyed to the State of New York in violation of the Trade and Intercourse Act of 1793 (the Non-Intercourse Act) and presently owned by the County. Id. at 229. On appeal to the Supreme Court, the County argued that the Oneida Nation's claim for unlawful possession was barred by the relevant state statute of limitations.

The Court noted that "[i]n the absence of a controlling federal limitations period, the general rule is that a state limitations period for an analogous cause of action is borrowed and applied to the federal claim, *provided that the application of the state statute would not be inconsistent with underlying federal policies*." Id. at 240 (emphasis added). The Court held that Oneida Nation's federal common law action was not subject to the applicable state statute of limitations, because "the borrowing of a state limitations period in these cases would be inconsistent with federal policy. Indeed on a number of occasions Congress has made this clear with respect to Indian land claims." Id. at 241 (emphasis omitted).

Plaintiffs argue that applying the relevant Oregon statute of

limitations to their treaty rights is inconsistent with federal law protecting treaty fishing rights from state law interference. See Menominee Tribe of Indians v. United States, 391 U.S. 404, 411-12 (1968); Adair, 723 F.2d at 1411; Kimball, 590 F.2d at 776-77; Kimball v. Callahan, 493 F.2d 564, 568-69 (9th Cir. 1974) Plaintiffs emphasize that the Klamath Termination Act explicitly provides that nothing in the Act shall be construed so as to abrogate fishing rights or privileges reserved under the Treaty of 1864. 25 U.S.C. § 564m(b). Thus, plaintiffs argue that application of statutes of limitations to curtail enforcement of their treaty rights constitutes a "back-handed abrogation" of those rights in violation of federal policy.

Defendant, in turn, argues that application of the statutes of limitations does not abrogate plaintiffs' fishing rights but merely requires plaintiffs to assert such rights in a timely manner. Defendant relies on the Supreme Court decision in South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 500 (1986), where the Court held that the relevant state limitations period applied to the Catawba Tribe's claim for possession of land held by the Tribe prior to the passage of the Non-Intercourse Act. Distinguishing County of Oneida, the Court reasoned that the Catawba Act's termination of federal services and protections "represents an explicit redefinition of the relationship between the Federal Government and the Catawbas; an intentional termination of the

special federal protection for the Tribe and its members; and a plain statement that state law applies to the Catawbas as to 'all other persons or citizens.'" Catawba Indian Tribe, 476 U.S. at 508. The Court concluded that "the explicit redefinition of the federal relationship reflected in the clear language of the Catawba Act requires the application of the state statute of limitations to the Tribe's claims." Id. at 510-11.

Although Catawba Indian Tribe did not involve rights reserved pursuant to treaty, defendant argues that its holding applies with equal force to plaintiffs' claims, because "[t]he Klamath Tribe's federal common law claim is an aboriginal right reserved, not created, by the Treaty of 1864." Defendant's Amended Response to the Klamath Tribe's Objections, p. 6. Even if Oregon statutes of limitations applied to claims of the Klamath Tribe as of its termination in 1961, I find that the intervening congressional act of restoration distinguishes this case from Catawba Indian Tribe.

In 1986, tribal status was restored to the Klamath through the Klamath Indian Tribe Restoration Act. 25 U.S.C. § 566, Pub. L. 99-398 (August 27, 1986, 100 Stat. 849). It explicitly provides:

> All rights and privileges of the tribe and the members of the tribe under any Federal treaty, Executive order, agreement or statute, or any other Federal authority, which may have been diminished or lost under the [Klamath Termination Act] approved August 13, 1954 (25 U.S.C. 564 et seq.) *are restored, and the provisions of such Act, to the extent that they are inconsistent with this Act, shall be inapplicable to the tribe and to members of the tribe after the date of the enactment of this Act.*

9 - OPINION AND ORDER

Id. § 566(b). In contrast to Catawba Indian Tribe, the Klamath Indian Tribe Restoration Act not only restores federal services and protections to the Klamath Tribe, it explicitly "restored" all treaty rights that were "diminished or lost" under the Klamath Termination Act. Given that "'canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians,'" the court must construe the Restoration Act "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985) (quoting County of Oneida, 470 U.S. at 247). If construed in favor of the Klamath Tribe, the Restoration Act arguably restores the right of the Tribe to enforce its treaty fishing rights if extinguished by virtue of Oregon statutes of limitations rendered applicable under the Klamath Termination Act.

Nonetheless, a recent Ninth Circuit opinion forecloses plaintiffs' right to file suit for damages based on the interference with their treaty fishing rights. In Skokomish Indian Tribe v. United States, 410 F.3d 506 (9th Cir. 2005) (en banc), the Skokomish Tribe brought suit against the United States, the City of Tacoma, and the Tacoma Public Utilities (TPU) seeking damages resulting from the impacts of a hydroelectric project on tribal lands and fisheries. Id. at 509-10. The Skokomish Tribe alleged that actions of the City and the TPU violated the Tribe's fishing

10- OPINION AND ORDER

rights under the Treaty of Point No Point, which reserved to the Skokomish Tribe "[t]he right of taking fish at usual and accustomed grounds and stations . . . in common with all citizens of the United States." Id. at 510.

The Ninth Circuit, sitting *en banc*, held that although a treaty may "provide rights of action for equitable relief against non-contracting parties," the Treaty of Point No Point did not provide a cause of action for *damages* against a non-party to a treaty based on alleged treaty violations. Id. at 512. The court noted that although the Treaty of Point No Point and similar treaties are generally "'self-enforcing' and thus do not require implementing legislation to form the basis of a lawsuit," the treaties by their terms "shall be obligatory on the *contracting parties*." Id. at 513. "However the City and TPU are not contracting parties to the Treaty. Nor is there anything in the language of the Treaty that would support a claim for damages against a non-contracting party." Id.

The Ninth Circuit distinguished several cases suggesting a contrary result, including County of Oneida, where the Oneida Nation was allowed to seek damages for the unlawful possession of its land. Skokomish Indian Tribe, 410 F.3d 513-14. The court explained that the decision in County of Oneida "was not based on any treaty. Rather, it was based on well-established federal common law principles regarding aboriginal possessory rights in

11- OPINION AND ORDER

land. By contrast, the Tribe in our case is seeking to collect damages for violation of fishing rights reserved to it by treaty." Skokomish Indian Tribe, 410 F.3d at 514. Thus, "there is no basis for implying the right of action for damages that the Tribe seeks to assert." Id. at 514.[1]

Here, plaintiffs do not seek prospective relief regarding the alleged interference with their treaty fishing rights. Rather, they seek damages of over $1 billion for violations of those rights. Further, the Treaty of 1864, like the Treaty of Point No Point, states that the Treaty "shall bind the contracting parties whenever the same is ratified by the Senate and the President of the United States," see Declaration of David A. Bledsoe, Ex. 3, p. 5, and neither Pacificorp nor its predecessors were contracting parties to the Treaty of 1864.

Finally, the reservation of fishing rights under the Treaty of 1864 does not materially differ from that of the Treaty of Point No Point. Both treaties reserve the right to take fish, albeit the Klamath's right is within (former) reservation lands while the Skokomish's right is in common with non-Indians at their "usual and accustomed grounds and stations." I do not find that this distinction renders the holding in Skokomish Indian Tribe

---

[1] Regardless of the soundness of these distinctions, see 410 F.3d at 523-27 (Berzon, J., dissenting), Skokomish Indian Tribe is Ninth Circuit precedent that this court is obligated to follow.

inapplicable to plaintiffs' claim for damages arising from interference with plaintiffs' treaty right to take fish.

Accordingly, Magistrate Judge Cooney's Recommendation is ADOPTED, although I decline to adopt the findings supporting the recommendation. Defendant's Motion for Summary Judgment (doc. 36) is GRANTED, and plaintiffs' motion for partial summary judgment (doc. 57) is DENIED as moot.

IT IS SO ORDERED.

Dated this __13__ day of July, 2005.


　　　　　　　　　　　　　　_____/s/ Ann Aiken_____
　　　　　　　　　　　　　　　　　　Ann Aiken
　　　　　　　　　　　　　United States District Judge